**<u>DEFENDANT GENERAL DYNAMICS CORPORATION'S</u>**
**<u>NOTICE OF REMOVAL</u>**

# EXHIBIT 1

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL1402757F-15

NEWPORT NEWS ........................................................................................................................ Circuit Court

2500 WASHINGTON AVENUE, NEWPORT NEWS 23607 ...............................................................................
ADDRESS

TO:

GENERAL DYNAMICS CORPORATION, CT CORPORATION SYSTEM

4701 COX RD

STE 285

GLEN ALLEN, VA 23060

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

SEPTEMBER 18, 2014 ...........................    DAVIS, REX A. _____ Clerk
DATE

by  /S/ SHANNON DEBUSK _____
DEPUTY CLERK

Instructions:

Hearing Official: ...............................................................................................

FORM CC-1400 MASTER 10/13

Uploaded: 2014SEP18 11:25 Filed By:JBLAYLOCK on behalf of Bar# 45447 WHARTY Reference: EF-6091
E-Filed: 2014SEP18 NEWPORT NEWS CC SDEBUSK at 2014SEP18 12:41 CL1402757F-15

VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF NEWPORT NEWS

CHARLES B. BRINKMAN
and LOUISE K. BRINKMAN

    Plaintiffs,

v.                      At Law No.: CL14-02757F-15 (TF)

**JOHN CRANE, INC.**
227 West Monroe St., Ste. 1800
Chicago, IL 60606
SERVE:      Secretary of the Commonwealth
           Patrick Henry Building, 4th Floor
           1111 East Broad Street
           Richmond, VA 23219

**J. HENRY HOLLAND CORPORATION**
5931 Thurston Avenue
Virginia Beach, Virginia 23455
SERVE:      RICHARD S. GUY
           REGISTERED AGENT
           101 W. Main Street
           500 World Trade Center
           Norfolk, Virginia 23510

**METROPOLITAN LIFE INSURANCE COMPANY**
1095 Avenue of the Americas
New York, NY 10036-6796
SERVE:      CT CORPORATION SYSTEM
           REGISTERED AGENT
           4701 Cox Road, Suite 285
           Glen Allen, VA 23060

**WACO, INC.**
5450 Lewis Road
Sandston, VA 23150
SERVE:      DANIEL M. WALKER
           REGISTERED AGENT
           5450 Lewis Road
           Sandston, Virginia 23150

**UNION CARBIDE CORPORATION**
A subsidiary of The Dow Chemical Company
1254 Enclave Parkway
Houston, TX  77077
SERVE:          CT CORPORATION SYSTEM
                REGISTERED AGENT
                4701 Cox Road, Suite 285
                Glen Allen, VA 23060

**NOLAND COMPANY**
3110 Ketterling Blvd.
Dayton, OH  45439
SERVE:          CORPORATION SERVICE COMPANY
                REGISTERED AGENT
                Bank of America Center, 16th Floor
                1111 East Main Street
                Richmond, VA  23219

**CLEAVER-BROOKS COMPANY, INC.**
**A division of AQUA-CHEM. INC.,**
11950 West Lake Park Drive
Milwaukee, WI 53201
SERVE:          Secretary of the Commonwealth
                Patrick Henry Building, 4th Floor
                1111 East Broad Street
                Richmond, VA  23219

**AURORA PUMP COMPANY**
13515 Ballantyne Corporate Place
Charlotte, NC  28277
Attn: Lynette Jones
SERVE:          Secretary of the Commonwealth
                Patrick Henry Building, 4th Floor
                1111 East Broad Street
                Richmond, VA  23219

**AIR & LIQUID SYSTEMS CORPORATION,**
**Successor by Merger to BUFFALO PUMPS, INC.**
874 Oliver Street
North Tonawanda NY 14120-3298
SERVE:          CT CORPORATION SYSTEM
                REGISTERED AGENT
                4701 Cox Road, Suite 285
                Glen Allen, VA  23060

2

**IMO INDUSTRIES, INC.**
**As successor in interest to DELAVAL PUMPS**
200 American Metro Blvd., Ste. 111
Hamilton, NJ  08619
SERVE:          CT CORPORATION SYSTEM
                      REGISTERED AGENT
                      4701 Cox Road, Suite 285
                      Glen Allen, Virginia 23060

**GOULDS PUMPS, INC.**
240 Fall Street
Seneca Falls, NY  13148
SERVE:          CT CORPORATION SYSTEM
                      REGISTERED AGENT
                      4701 Cox Rd., Suite 285
                      Glen Allen, VA 23060

**INGERSOLL-RAND COMPANY**
800 Beaty Street
Davidson, NC  28036
SERVE:          CT CORPORATION SYSTEM
                      REGISTERED AGENT
                      4701 Cox Road, Suite 285
                      Glen Allen, VA 23060

**THE NASH ENGINEERING COMPANY**
c/o Mark Nordenson
45 Forest Falls Dr., Ste. B4
Yarmouth, ME  04096
SERVE:          Secretary of the Commonwealth
                      Patrick Henry Building, 4th Floor
                      1111 East Broad Street
                      Richmond, VA  23219

**WARREN PUMPS, INC.**
82 Bridges Ave.
Warren, MA 01083-0969
SERVE:          Secretary of the Commonwealth
                      Patrick Henry Building, 4th Floor
                      1111 East Broad Street
                      Richmond, VA  23219

**CRANE CO.**
100 First Stamford Place
Stamford, CT  06902
SERVE:          Secretary of the Commonwealth
                Patrick Henry Building, 4th Floor
                1111 East Broad Street
                Richmond, VA  23219

**GRINNELL CORPORATION**
CT Corporation System
116 Pine St., Ste. 320, 3rd Floor
Harrisburg, PA  17101
SERVE:          Secretary of the Commonwealth
                Patrick Henry Building, 4th Floor
                1111 East Broad Street
                Richmond, VA  23219

**THE J. R. CLARKSON COMPANY**
**Individually and as Successor by mergers to**
**KUNKLE INDUSTRIES, INC.**
10707 Clay Road
Houston, TX  77041
SERVE:          Secretary of the Commonwealth
                Patrick Henry Building, 4th Floor
                1111 East Broad Street
                Richmond, VA  23219

**VELAN VALVE CORP.**
94 Avenue C
Williston, VT  05495-9732
SERVE:          Secretary of the Commonwealth
                Patrick Henry Building, 4th Floor
                1111 East Broad Street
                Richmond, VA  23219

**TRANE U.S. INC., f/k/a AMERICAN STANDARD, INC.**
One Centennial Avenue
Piscataway, NJ  08855-6820
SERVE:          CT CORPORATION SYSTEM
                REGISTERED AGENT
                4701 Cox Road, Suite 285
                Glen Allen, VA 23060

**GENERAL DYNAMICS CORPORATION**
2941 Fairview Park Drive
Suite 100
Falls Church, VA 22042
SERVE:     C T CORPORATION SYSTEM
              REGISTERED AGENT
              4701 Cox Road, Suite 285
              Glen Allen, VA 23060

**ELECTRIC BOAT CORPORATION**
75 Eastern Point Road
Dept. 613, J88-10
Groton, CT 06340
SERVE:     C T CORPORATION SYSTEM
              REGISTERED AGENT
              4701 Cox Road, Suite 285
              Glen Allen, VA 23060

      Defendants.

## COMPLAINT

NOW COMES CHARLES B. BRINKMAN and LOUISE K. BRINKMAN and allege as follows:

1.      This action is subject to the Standing Orders entered in the Circuit Court for the City of Newport News in regards to asbestos cases filed by the firm of Patten, Wornom, Hatten & Diamonstein, L.C.

2.      As used hereafter, the term "asbestos-containing product" will be used to identify collectively: (i) raw asbestos fiber, (ii) end products directly incorporating asbestos fiber, and (iii) end products manufactured, assembled or supplied by a defendant who has specified and/or required raw asbestos and/or products incorporating asbestos manufactured or supplied by others, to be used, whether internally or externally, in conjunction with the end product for the routine maintenance, repair, and/or proper and intended use and operation of the end product.

3.      As used hereafter, the term "asbestos-containing packing" shall include asbestos-containing sheet packing, gaskets, braided packing, extruded packing, and all other such products designed for use in sealing pipe flanges, valves, pumps, turbines, generators, bulkheads, and for other such applications.

4.      With the exception of the defendants Electric Boat Corporation and General Dynamics Corporation, all other defendants may hereafter be designated variously as the "Manufacturers" or the "Manufacturing Defendants", and are corporations, companies, or other business entities which mine, manufacture, process, import, convert, compound and/or supply asbestos containing materials and/or asbestos containing equipment.

5.      As used hereafter, the term "Shipyard" or "Shipyard Defendant" shall refer to a certain shipyard, specializing in the construction, repair and overhaul of Naval submarines, known General Dynamics Electric Boat, a Division of General Dynamics Corporation, formerly known as

Electric Boat Company, located in Groton, Connecticut.

6.     The Plaintiff CHARLES B. BRINKMAN was born on October 8, 1939.

7.     The Plaintiff CHARLES B. BRINKMAN served in the United States Navy as a

nuclear submariner from approximately 1962 until 1970. The following is a summary of CHARLES

B. BRINKMAN'S Naval service:

> College:     From approximately 1957 until 1962, the Plaintiff attended the
> University of Rochester, where he was a member of the Naval ROTC program, and
> he graduated with a Bachelor of Science degree in mechanical engineering.

> Submarine training:    Following graduation, he was commissioned an Ensign
> in the United States Navy, and was assigned to the USS Sea Leopard (SS-483) from
> approximately July 1962 until September 1962. The USS Sea Leopard was home
> ported in Norfolk, Virginia. From approximately September 1962 until March 1963,
> the Plaintiff attended US Naval Nuclear Power School at the US Naval Training
> Center, Bainbridge, Md. From approximately March 1963 until October 1963, the
> Plaintiff was assigned to the US Naval Nuclear Power Training Unit in Schenectady,
> NY. From approximately November 1963 until April 1964, the Plaintiff attended US
> Naval Submarine School, Groton, CT.

> USS John Marshall (SSBN-611)(Blue):     From approximately April 1964
> until July 1966, the Plaintiff served five (5) patrols aboard the USS John Marshall
> which was home ported in Holy Loch, Scotland, operating out of Groton, CT.
> During this time, Plaintiff's assignments included, but were not limited to, Assistant
> Communications Officer, Reactor Control Officer, Electrical Officer, Assistant Main
> Propulsion Officer, Diving Watch Officer and Commissary Officer.

> USS Will Rogers (SSBN-659)(Gold):     From approximately July 1966
> until April 1967, the Plaintiff was assigned to the pre-commissioning unit of the USS
> Will Rogers, initially as Engineering Division Officer and thereafter as the Engineer
> of the Watch. Throughout this timeframe, the submarine was under construction at
> the Electric Boat Company, Groton, CT. The Plaintiff boarded the submarine
> approximately two (2) weeks before her launch, and with the exception of one day
> per month, which he had off, the Plaintiff worked aboard the USS Will Rogers on a
> daily basis, in close proximity to other Navy personnel as well as shipyard workers,
> until the ship was commissioned in April 1967. From approximately April 1967
> until June 1967, the Plaintiff participated in a shakedown cruise of the USS Will
> Rogers. Following the shakedown cruise, the Plaintiff was assigned to pre-
> deployment training, and he served one (1) Polaris Patrol, assigned to the Gold Crew
> of the USS Will Rogers. During this time, the Plaintiff's assignments included, but
> were not limited to:  Assistant Main Propulsion Officer; Electrical and Interior
> Communications Division Officer; and Engineering Department Division Officer.
> The Plaintiff transferred off of the USS Will Rogers in approximately May, 1968 at

which time he attended the US Naval Guided Missile School, Dam Neck, Virginia. This course lasted until approximately July 1968 at which time the Plaintiff was assigned to the USS George Bancroft.

USS George Bancroft (SSBN-643)(Blue):    The Plaintiff served aboard the USS George Bancroft from approximately August 1968 until he was honorably discharged from the Navy in February 1970 having attained the rank of Lieutenant. His assignments aboard this submarine include, but are not limited to Assistant Weapons officer, and Weapons Officer.

As a result of the employment history as set forth, it is believed that CHARLES B. BRINKMAN was exposed to asbestos dust, fibers, and/or particles.

8.    On or about May 14, 2014, CHARLES B. BRINKMAN was diagnosed with malignant mesothelioma as a result of his exposure to asbestos dust, fibers and/or particles.

9.    The Manufacturing Defendants are corporations, companies or other business entities which, during all times material hereto, and for a long time prior thereto have been, and/or are now engaged, directly or indirectly, in the manufacturing, producing, selling, merchandising, supplying, distributing, and/or otherwise placing in the stream of commerce, asbestos-containing products, including those uniquely and specifically designed for maritime use and marketed for installation aboard ships.  This case arises under the law of Virginia and within the admiralty and maritime jurisdiction pursuant to Title 28 U.S.C. §1333(1) and Title 46 U.S.C. §30101 and the general admiralty and maritime law of the United States.

10.    The Shipyard Defendant is a corporation, company or other business entity which, during all times material hereto, and for a long time prior thereto, has been, and/or is now engaged in the construction, repair and/or overhaul of Naval submarines, including, but not limited to the USS Will Rogers (SSBN-659).  The Will Rogers was constructed by the Shipyard Defendant beginning March 20, 1965 and it continued until she was commissioned and delivered to the Navy on April 1, 1967.  As stated above, the Plaintiff, CHARLES B. BRINKMAN was stationed aboard the USS Will Rogers as a member of its pre-commissioning crew from approximately July 1966 until its

8

completion in April 1967 and thereafter.  During this period of time, the Plaintiff, CHARLES B. BRINKMAN, worked aboard the USS Will Rogers on a daily basis in close proximity to employees and sub-contractors of the Shipyard Defendant, who were handling, installing, removing and otherwise manipulating asbestos containing materials and equipment, and he breathed air containing particles of asbestos dust arising from these materials, equipment and activities.

11.    At all times material hereto, Defendants acted through their agents, servants or employees who were acting within the scope of their employment on the business of the Defendants.

12.    The Plaintiff CHARLES B. BRINKMAN was exposed to asbestos-containing products that were manufactured, specified, distributed, and or used by the Defendants.  These asbestos-containing products were defective and inherently dangerous in the manner in which they were marketed for their failure to contain or include adequate warnings regarding potential asbestos health hazards associated with the use, removal or maintenance of, or the exposure to the products. Additionally, these products were abnormally and inherently dangerous in that they were used by the Shipyard Defendant without warning workers, guests, and/or visitors of the potential asbestos health hazards associated with the exposure to these products. The defective and inherently dangerous condition of these asbestos-containing products, coupled with the disabling and/or fatal diseases generated by the inhalation of asbestos dust, rendered such asbestos-containing products unreasonably and inherently dangerous and thereby abrogated any need for privity of contract between the Plaintiff CHARLES B. BRINKMAN and these Defendants as a prerequisite to liability. This in turn imposed an elevated duty of care upon the Shipyard Defendant in its use of such abnormally and inherently dangerous products and its obligation to warn workers, guests, and/or other visitors of the dangers associated with the inhalation of asbestos fibers.

13.    As more specifically detailed below, the Manufacturing Defendants are only being sued for their failure to warn of the hazards of asbestos exposure and conspiracy, and are not being

sued on any other theory, including any design defect or any theory arising from the Manufacturing Defendant's acts, if any, at the direction of a Federal Officer and such other theories are expressly waived. The Manufacturing Defendants' failure to warn renders them liable in negligence (as set forth in Counts I), for a breach of their implied warranty of merchantability (as set forth in Count III), for strict liability in tort (as set forth in Count IV), for spousal pre-death loss of society and consortium (as set forth in Count V), and for conspiracy (as set forth in Count VI). The Shipyard Defendant's failure to warn renders it liable in negligence (as set forth in Count II) Additionally, the Plaintiffs expressly disclaim any claim, if any, arising under the Death on the High Seas Act, 46 U.S.C. §30301 et seq.

      14.    At all times material hereto:

      (a).    Defendant, JOHN CRANE, INC., a Delaware corporation, manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, asbestos-containing packing materials and asbestos-containing gasket materials as defined above.

      (b).    Defendant, J. HENRY HOLLAND CORPORATION, a Virginia corporation, manufactured, produced, distributed and/or sold, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products and/or insulation materials including, without limitation, asbestos-containing packing materials and asbestos-containing gasket materials as defined above.

      (c).    Defendant, METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation authorized to do business in the Commonwealth of Virginia, has its principal place of business at 1 Madison Avenue, New York, New York 10010. This defendant did not manufacture, sell or distribute asbestos-containing products, but this defendant acted in conspiracy with other defendants as set forth below in Count V.

(d).    Defendant, WACO, INC., a corporation incorporated under the rules of Virginia having its corporate offices at 814 Chapman Way, Newport News, Virginia, and a successor to WACO INSULATION, INC, sold, distributed and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, various asbestos-containing products including, without limitation, ship construction and/or repair products like pipecovering sections, block, cement and textiles manufactured by different companies.

(e).    Defendant, UNION CARBIDE CORPORATION, a New York corporation, manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, electrical products, plasters, and asbestos resins such as General Purpose Bakelite, Heat Resistant Bakelite, High Impact Heat Resistant Bakelite, Bakelite Molding Compound. This Defendant also sold and/or distributed bulk quantities of raw asbestos fibers mined from the Calidria Mines to many of the defendants listed herein for incorporation into their asbestos-containing products under various trade names.

(f).    Defendant, NOLAND COMPANY, a Virginia corporation, sold, distributed and/or supplied, either directly or indirectly, to Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, pipecovering sections, block, cement, gaskets, packing, and/or textiles manufactured by different companies.

(g).    Defendant, CLEAVER-BROOKS COMPANY INC., a corporation organized and existing under the laws of Wisconsin and a subsidiary of AQUA-CHEM, INC., a corporation organized and existing under the laws of the Delaware, manufactured, produced, sold, distributed and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, distilling units, burners, evaporators, and/or water heaters which contained asbestos and/or incorporated asbestos-containing component parts therein as

11

well as repair and/or replacement materials including, including without limitation, asbestos-containing packing materials and asbestos-containing gaskets materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(h).   Defendant, AURORA PUMP COMPANY supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, for use on vessels pump sets and combined electric cooling fresh water and salt water circulating pumps, that incorporated internal asbestos-containing component parts, asbestos-containing packing materials and/or asbestos-containing gasket materials as defined above as well as repair and/or replacement materials including, without limitation, asbestos-containing packing materials and asbestos-containing gaskets materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(i).   Defendant, AIR & LIQUID SYSTEMS CORPORATION, a Pennsylvania corporation and Successor in Merger to BUFFALO PUMPS, INC., manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, pumps, condensate pumps, main sea water cooling pumps, low pressure brine pumps, auxiliary sea water pumps, distillate pumps, distilling plant distillate pumps, distilling plant low pressure brine pumps, distilling system high pressure brine pumps, low pressure brine and acid circulating pumps, and pump repair and/or replacement materials including, without limitation, asbestos-containing products, asbestos-containing packing materials and asbestos-containing gasket materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(j).   Defendant, IMO INDUSTRIES, INC., a Delaware corporation, as successor in

12

interest to DeLaval Pumps, manufactured, specified, produced, distributed and/or sold, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, pumps, insulation, and pump repair and/or replacement materials including, without limitation, asbestos-containing products, asbestos-containing packing materials and asbestos-containing gasket materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

      (k).    Defendant, GOULDS PUMPS INC., a Delaware corporation, manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, pumps, condensate pumps, main sea water cooling pumps, low pressure brine pumps, auxiliary sea water pumps, distillate pumps, distilling plant distillate pumps, distilling plant low pressure brine pumps, distilling system high pressure brine pumps, low pressure brine and acid circulating pumps, and pump repair and/or replacement materials including asbestos-containing products including, without limitation, asbestos-containing packing materials and asbestos-containing gasket materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

      (l).    Defendant, INGERSOLL-RAND COMPANY, a New Jersey corporation, manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including pumps, including without limitation, condensate pumps, main sea water cooling pumps, low pressure brine pumps, auxiliary sea water pumps, distillate pumps, distilling plant distillate pumps, distilling plant low pressure brine pumps, distilling system high pressure brine pumps, low pressure brine and acid circulating pumps, and pump repair and/or replacement materials including asbestos-containing

packing and asbestos-containing gaskets materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(m).   Defendant, THE NASH ENGINEERING COMPANY, a Connecticut corporation, manufactured, produced, sold, distributed and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, pumps, condensate pumps, main sea water cooling pumps, low pressure brine pumps, auxiliary sea water pumps, distillate pumps, distilling plant distillate pumps, distilling plant low pressure brine pumps, distilling system high pressure brine pumps, low pressure brine and acid circulating pumps, and pump repair and/or replacement materials including asbestos-containing products including, without limitation, asbestos-containing packing materials and asbestos-containing gasket materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(n).   Defendant, WARREN PUMPS, INC., a Massachusetts corporation, manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, pumps, condensate pumps, main sea water cooling pumps, low pressure brine pumps, auxiliary sea water pumps, distillate pumps, distilling plant distillate pumps, distilling plant low pressure brine pumps, distilling system high pressure brine pumps, low pressure brine and acid circulating pumps, and pump repair and/or replacement materials including asbestos-containing products including, without limitation, asbestos-containing packing materials and asbestos-containing gasket materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

14

(o).    Defendant, CRANE CO., a Delaware corporation, manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, pumps, valves, insulating products, and pump and valve repair and/or replacement materials including, without limitation asbestos-containing packing materials and asbestos-containing gasket materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(p).    Defendant, GRINNELL CORPORATION, a Delaware corporation, manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, valves and repair and/or replacement materials including, without limitation asbestos-containing packing materials and asbestos-containing gasket materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(q).    Defendant, THE J. R. CLARKSON COMPANY, a Nevada corporation and Successor by mergers to KUNKLE INDUSTRIES, INC., who manufactured, produced, sold, distributed and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, valves, steam traps, and repair and/or replacement materials including, without limitation, asbestos-containing packing materials and asbestos-containing gasket materials as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(r).    Defendant, VELAN VALVE CORP., a Canadian corporation with its principle place of business in the United States at 94 Avenue C, Williston, Vermont, manufactured,

produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, asbestos-containing products including, without limitation, valves and repair and/or replacement materials including asbestos-containing packing as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(s).     Defendant, TRANE US, INC., F/K/A AMERICAN STANDARD, INC., a corporation organized and existing under the laws of the Delaware, manufactured, produced, sold, distributed and/or supplied, either directly or indirectly, to the Plaintiff and/or Plaintiff's employer, condensate coolers which contained asbestos and/or incorporated asbestos-containing component parts therein and/or repair and/or replacement materials including asbestos-containing packing as defined above. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(t).     Premises Defendant, GENERAL DYNAMICS CORPORATION, a Delaware corporation and parent and/or owner of Electric Boat Corporation, whose business includes the construction, repair, maintenance and/or overhaul of vessels in Groton, Connecticut.

(u).     Premises Defendant, ELECTRIC BOAT CORPORATION, a Delaware corporation and wholly-owned subsidiary and/or division of General Dynamics Corporation, whose business includes the construction, repair, maintenance and/or overhaul of vessels in Groton, Connecticut.

15.     Throughout CHARLES B. BRINKMAN's service in the United States Navy from approximately 1962 until 1970, he worked aboard vessels, both in dry dock and on the navigable waters of the United States, including without limitation the territorial waters of the Commonwealth of Virginia, performing the traditional maritime activities of shipbuilding and/or ship repair. Plaintiffs are unaware of any actionable exposure on the high seas. During the performance of

traditional maritime activities while serving in the United States Navy, CHARLES B. BRINKMAN was continuously and daily required to work in close proximity to individuals who were installing, removing, repairing, altering, fabricating, working with, using, and/or handling asbestos containing products and equipment and he therefore came into contact with and/or was exposed to asbestos-containing products that were used, manufactured, sold, supplied, distributed and/or otherwise placed in the stream of commerce by the Defendants, resulting in inhalation of asbestos dust, fibers and/or particles generated from the intended, ordinary and foreseeable use of Defendants' asbestos-containing products. Plaintiff's clothes, his person, and/or his belongings were covered with and contaminated with asbestos dust, fibers and/or particles generated from the intended, ordinary and foreseeable use of the Defendants' asbestos-containing products. The Plaintiff's exposure to and inhalation of asbestos dust, fibers and/or particles proximately resulted in the Plaintiff's contracting malignant mesothelioma, which is permanent and/or fatal cancer.

17

## COUNT I – NEGLIGENCE
## OF THE MANUFACTURING DEFENDANTS

16.     The Plaintiffs hereby incorporate by reference Paragraphs ONE (1) through FIFTEEN

(15), inclusive, as if the same were hereto set forth at length.  As used herein, the term "Defendant"

refers only to the Manufacturing defendants.

17.     At all times material hereto, the Plaintiff CHARLES B. BRINKMAN was not aware

of the nature and extent of the danger to his respiratory system, heart, other bodily parts, and general

health that would result from his contact with, exposure to and inhalation of the asbestos dust, fibers,

and/or particles resulting from the intended, ordinary and foreseeable use of the Defendants'

asbestos-containing products;  whereas, each of the Defendants knew, had reason to know, should

have known and/or could have reasonably determined that the Plaintiff CHARLES B. BRINKMAN

would inhale asbestos dust, fibers and/or particles during or as a consequence of the intended,

ordinary and foreseeable use of their asbestos-containing products, and despite such facts,

Defendants, individually, jointly, and severally were negligent pursuant to maritime negligence law

in one or more of the following respects:

(a).     Mined, manufactured, sold, distributed, and/or otherwise placed in the stream

of commerce asbestos-containing products, which Defendants knew or in the exercise of ordinary

care should have known, and/or had reason to know, were imminently and inherently dangerous,

defective, and otherwise highly harmful to the Plaintiff CHARLES B. BRINKMAN and others

exposed to asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable

use of their asbestos-containing products;

(b).     Failed to take reasonable precautions or to exercise reasonable care to

adequately or sufficiently warn the Plaintiff CHARLES B. BRINKMAN, of the dangers and harm to

which he was exposed as a consequence of the inhalation of asbestos dust, fibers and/or particles

resulting from the intended, ordinary and foreseeable use of their asbestos-containing products;

(c).     Failed and omitted to provide the Plaintiff CHARLES B. BRINKMAN with the knowledge of reasonably safe and sufficient safeguards, wearing apparel, proper safety equipment and appliances needed to protect him from being injured, disabled, killed, or otherwise harmed by working with, using, handling, coming into contact with, and inhaling the asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing products;

(d).     Failed to place any warnings or adequate and sufficient warnings on or inside the containers of their asbestos-containing products and to suitably apprise the Plaintiff CHARLES B. BRINKMAN of the risks and dangers inherent to the intended, ordinary and foreseeable use of their asbestos-containing products and the precautions necessary to make their asbestos-containing products safe for their intended, ordinary and foreseeable uses;

(e).     Failed to place any warnings or adequate and sufficient warnings on or inside the packaging of their asbestos-containing products, or otherwise, to inform the Plaintiff CHARLES B. BRINKMAN or any foreseeable user, of the dangers inherent in the repair and replacement of such asbestos-containing products, which repair and replacement foreseeably required the removal of friable and inherently dangerous asbestos-containing packing and/or insulation materials.

(f).     Failed to place warnings, or adequate and sufficient warnings on or inside the containers of their asbestos-containing products, or in technical manuals, drawings or specifications supplied with their asbestos-containing products to inform the Plaintiff CHARLES B. BRINKMAN of the enhanced risk and dangers inherent in the intended, ordinary and foreseeable use of their asbestos-containing products in the environment of military shipbuilding and/or ship repair where the Defendants knew, should have known and/or had reason to know that many other asbestos-containing products were also being dangerously and simultaneously used without controls of safety

procedures;

(g).    Failed to adequately test their asbestos-containing products to determine the nature and extent of the risk from the foreseeable use, maintenance, repair and/or removal of their products and the need for warnings and recommended safety instructions to eliminate or reduce that risk;

(h).    Failed to advise the Plaintiff CHARLES B. BRINKMAN, whom the Defendants knew, should have known, and/or had reason to know, was exposed to asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing products, to cease all future exposure to asbestos dust, fibers and/or particles, to be examined by a lung specialist to determine the nature and extent of any and all asbestos diseases caused by such exposure, and to receive treatment for such diseases.

18.    Such negligent and deliberate acts of the Defendants proximately resulted in the Plaintiff's long-term inhalation of asbestos dust, fibers and/or particles from the intended, ordinary and foreseeable use of Defendants' asbestos-containing products, including the routine, recommended and expected maintenance of the Defendants' asbestos-containing products, and this exposure directly and proximately caused the Plaintiff CHARLES B. BRINKMAN to contract malignant mesothelioma, which is permanent and/or fatal cancer.

19.    The Defendants' foregoing acts, failures and/or omissions were willful or wanton in nature, were undertaken with actual or constructive knowledge that injury would result, and/or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of the Plaintiff CHARLES B. BRINKMAN.

## COUNT II – NEGLIGENCE
## OF THE SHIPYARD DEFENDANT

20.     The Plaintiffs hereby incorporate by reference Paragraphs ONE (1) through NINETEEN (19), inclusive, as if the same were hereto set forth at length. As used herein, the term "Defendant" refers only to the Shipyard Defendant.

21.     The Shipyard Defendant was negligent in some or all of the following respects and such negligence proximately caused or substantially contributed to cause the Plaintiff's Mesothelioma and other injuries and disabilities:

      a.    In failing to adequately warn Plaintiff of the dangerous characteristics of the asbestos and/or asbestos-containing products used by or around Plaintiff while he was located on the premises of a shipyard that was privately owned, operated, and/or controlled by the Defendant.

      b.    In failing to warn Plaintiff of the dangers to him of being in and/or around asbestos and/or asbestos-containing products without sufficient protective apparel, equipment and appliances and failing to provide him with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if any existed, to protect Plaintiff from being harmed and disabled from exposure to asbestos;

      c.    In failing to take reasonable care or precautions to warn Plaintiff through the publication and adoption of a safety plan and a safe method of handling and installing asbestos materials and in failing to enforce such a plan or method;

      d.    In failing to continually warn or advise Plaintiff and others similarly situated, who the Defendant either knew, had reason to know, or should have known had been exposed to the danger of inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of the asbestos and/or asbestos-containing products, to cease all future exposure to the danger of inhalation of all types of other fumes, smoke, dust or fibers, and to keep dust and fibers on work clothes and tools away from the home environment;

      e.    In failing to establish and enforce any procedure to post warnings or cautionary signs in areas where asbestos products were being installed, removed, repaired, altered, fabricated, worked with, used or handled, which were reasonably calculated to advise persons, such as the Plaintiff or those similarly situated, of the known dangers and risks, including the contraction of mesothelioma, associated with the inhalation and/or ingestion of asbestos fibers and dust;

21

f.   In failing to adequately educate and train its workers as to a safe and proper procedure to follow when working in or around an area where asbestos products were being installed, removed, repaired, altered, fabricated, worked with, used or handled, so as to minimize the chances that those in the general vicinity of the asbestos dust, such as the Plaintiff, would have their clothing, belongings and persons be contaminated by asbestos fibers and dust.

g.   In failing to provide persons at the Shipyard in the vicinity of asbestos dust with proper wearing apparel, safety equipment and showers so as to minimize the chances that any asbestos contamination to such person.

h.   In failing to establish and enforce safe and sufficient procedures to collect and contain asbestos dust in areas where persons, such as the Plaintiff would be exposed to asbestos fibers and dust and where his clothing, belongings and persons would be contaminated by asbestos fibers and dust;

i.   In failing to warn persons, such as the Plaintiff of the known dangers and risks, including the contraction of mesothelioma, that could result if asbestos fibers and dust were breathed or ingested.

j.   In failing to take any steps reasonably calculated to adequately and sufficiently warn such persons as the Plaintiff and other similarly situated of the known risks and dangers, including the contraction of mesothelioma, associated with the inhalation and/or ingestion of asbestos fibers and dust;

k.   In failing to make any reasonable effort to instruct or advise the Plaintiff and others similarly situated, of the importance of periodic examinations by medical specialists in order to determine the nature and extent of any asbestos-caused disease from which he might be suffering from the exposures to asbestos fibers and dust from the Defendants' premises, as afore described, and to allow the prompt evaluation and/or treatment thereof, if any;

l.   In failing to protect the Plaintiff and others similarly situated from being exposed to asbestos dust and fibers resulting from work performed on the Defendants' private premises;

m.   In failing to provide the Plaintiff and those similarly situated, with respirators and/or other protective devices in order to prevent the Plaintiff from inhaling or ingesting asbestos dust and fibers;

n.   In failing to prevent the release of a toxic carcinogenic substance from its premises; and

o.   In failing to take all necessary and reasonable safety precautions to prevent the Plaintiff, and others similarly situated, from being exposed to asbestos dust and fibers on their premises.

22.     The asbestos-containing products to which Plaintiff was exposed and which proximately caused or substantially contributed to Plaintiff's injuries were used in the manner in which the Defendant intended them to be used, and the Defendant knew, had reason to know, or should have known of the inherently dangerous, unavoidably unsafe, and/or unreasonably dangerous character and nature of their respective asbestos containing products.   Moreover, the Defendant controlled the premises on which the Plaintiff was working, and it likewise controlled the method and manner of the work that its employees were performing around the Plaintiff, and it controlled the materials that its employees were using.  As a direct and proximate result of the negligence, gross negligence, and/or willful disregard of the Plaintiff's health and safety as aforesaid, Plaintiff contracted mesothelioma and other disabilities and injuries, some or all of which were permanent and/or fatal. The Defendants' foregoing acts, failures and/or omissions were willful or wanton in nature, were undertaken with actual or constructive knowledge that injury would result, and/or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of the Plaintiff CHARLES B. BRINKMAN.

## COUNT III - BREACH OF IMPLIED WARRANTY

23.     The Plaintiffs hereby incorporate by reference Paragraphs ONE (1) through TWENTY-TWO (22), inclusive, as if the same were hereto set forth at length. As used herein, the term "Defendant" refers only to the Manufacturing defendants.

24.     Defendants impliedly warranted that their asbestos-containing products were reasonably fit for use and safe for their intended purposes.

25.     At the time of the manufacture and sale of their asbestos-containing products to the Plaintiff and/or the Plaintiff's employer, the Defendants knew, should have known and/or had reason to know, that Plaintiff CHARLES B. BRINKMAN was a person whom the Defendants might reasonably have expected to use, consume, or be affected by their asbestos-containing products.

26.     Throughout the years that the Plaintiff CHARLES B. BRINKMAN was exposed to Defendants' asbestos-containing products, the Defendants expected that their asbestos-containing products would reach, and they in fact did reach, the ultimate user or consumer without substantial change in the condition in which they were sold.

27.     The Defendants' asbestos-containing products were sold in a defective condition in that they were incapable of being made safe for their intended, ordinary and foreseeable use, and said Defendants failed to give adequate or sufficient warnings or instructions about the unreasonable risks and dangers inherent in their asbestos-containing products.

28.     Defendants breached said warranties to the Plaintiff CHARLES B. BRINKMAN in that their asbestos-containing products were imminently and inherently dangerous, defective, hazardous, unfit for use, not properly merchantable, and not safe for their intended, ordinary and foreseeable uses and/or purposes and such breaches proximately resulted in the Plaintiff CHARLES B. BRINKMAN contracting malignant mesothelioma, which is permanent and/or fatal cancer.

29.     The Defendants' breaches of said warranties to the Plaintiff CHARLES B.

BRINKMAN were willful or wanton in nature, were undertaken with actual or constructive knowledge that injury would result, and/or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of the Plaintiff CHARLES B. BRINKMAN.

## COUNT IV – STRICT LIABILTY

30.     The Plaintiffs hereby incorporate by reference Paragraphs ONE (1) through
TWENTY-NINE (29), inclusive, as if the same were hereto set forth at length. As used herein, the
term "Defendants" refers only to the Manufacturing defendants.

31.     Defendants knew, had reason to know and/or in the exercise of reasonable care
should have known, that their asbestos-containing products would be sold to the public including
Plaintiff and/or the Plaintiff's employer as aforesaid and would be used by or around the Plaintiff
CHARLES B. BRINKMAN and other persons similarly employed, and would be relied on by such
persons to be fit for the use and to accomplish the purpose for which they were mined, manufactured,
produced, processed, sold, supplied, distributed, and/or otherwise placed in the stream of commerce.
The Defendants, because of their positions as miners, manufacturers, producers, processors, sellers,
suppliers, and/or distributors, are strictly liable to the Plaintiff CHARLES B. BRINKMAN for the
following reasons:

(a).    That Defendants, as manufacturers-sellers, are engaged in the business, inter
alia, of selling asbestos-containing products;

(b).    That, at the time of the manufacture and sale of their asbestos-containing
products by the Defendants to the Plaintiff and/or Plaintiff's employer, Defendant knew, had reason
to know, and/or should have known, that their asbestos-containing products would be used by or
around the Plaintiff CHARLES B. BRINKMAN and other persons similarly employed, as the
ultimate user or consumer or otherwise affected person;

(c).    That the Defendants' asbestos-containing products were sold in a defective
condition, unreasonably dangerous to the Plaintiff CHARLES B. BRINKMAN and other similarly
employed, as users or consumers, and that, all throughout many years of the Plaintiff's exposure to
and use of the Defendants' asbestos-containing products, the asbestos-containing products were

26

expected to and did reach the user or consumer without substantial change in the condition in which they were sold;

(d). That the Defendants' asbestos-containing products were defective in that they were incapable of being made safe for their intended, ordinary and foreseeable use, and the Defendants failed to give adequate or sufficient warnings or instructions about the risks and dangers inherent in the products; and

(e). That the intended, ordinary and foreseeable use of the Defendants' asbestos-containing products is an intrinsically dangerous and/or ultrahazardous activity.

32. The Defendants' breaches of duty under traditional maritime strict liability standards, as restated and summarized in §402(A) of the Restatement (Second) of Torts, as described herein proximately caused or contributed to cause the Plaintiff CHARLES B. BRINKMAN to contract malignant mesothelioma, which is permanent and/or fatal cancer.

33. The Defendants' breaches of duty under traditional maritime strict liability standards, as restated and summarized in §402(A) of the Restatement (Second) of Torts, as described herein were willful or wanton in nature, were undertaken with actual or constructive knowledge that injury would result, and/or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of the Plaintiff CHARLES B. BRINKMAN.

## COUNT V: SPOUSAL PRE-DEATH LOSS
## OF SOCIETY AND CONSORTIUM

34.     The Plaintiffs hereby incorporate by reference Paragraphs ONE (1) through THIRTY-THREE (33), inclusive, as if the same were hereto set forth at length.

35.     The Plaintiffs CHARLES B. BRINKMAN and LOUISE K. BRINKMAN were married on August 25, 1962 and have lived together as a married couple for 52 years. Throughout that time, CHARLES B. BRINKMAN has been available to comfort, protect, care for, aid, attend to, and support LOUISE K. BRINKMAN's physically, mentally, and emotionally.

36.     As set forth above, Plaintiff CHARLES B. BRINKMAN suffers from malignant mesothelioma, a debilitating and terminal condition with an average life expectancy of six to eighteen months. Plaintiff's disease and its impact upon his bodily systems, along with the necessary and proper treatments for that disease have caused him extreme fatigue, pain, delirium, constipation, loss of appetite, anemia, sepsis, repeated hospital treatments and surgery. As his disease progresses, he has been largely confined to his home, with the exception medical treatments, and he has been unable to participate in any of the normal recreational, social, or marital activities of life which are normal to a good marriage and to which CHARLES B. BRINKMAN and LOUISE K. BRINKMAN have been accustomed.

37.     As a proximate result of the Defendant's failure to warn, which was a substantial contributing factor in the development of Plaintiff CHARLES B. BRINKMAN's disease and condition as set forth above, Plaintiff's Spouse LOUISE K. BRINKMAN has been deprived of the physical, mental, and emotional services, comfort, society, attentions, pleasure, solace, fellowship, marital life, companionship, and consortium of her husband.

28

## COUNT VI - CONSPIRACY

38.     The Plaintiffs hereby incorporate by reference Paragraphs ONE (1) through THIRTY-SEVEN (37), inclusive, as if the same were hereto set forth at length.

39.     Defendants, individually, jointly, in conspiracy with each other, and as an industrial and trade association or group for many decades have been possessed of medical and scientific data which clearly indicated that the inhalation of asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing products were imminently, inherently and unreasonably dangerous, carcinogenic, and potentially deadly.

40.     Despite the medical and scientific data possessed by and available to them, the Defendants, prompted by pecuniary motives, individually, jointly, and in conspiracy with each other, fraudulently, willfully, deliberately, maliciously and callously:

(a).     Ignored, withheld, and/or actively concealed said medical and scientific data from the public, and particularly persons like the Plaintiff CHARLES B. BRINKMAN, who were using and/or being exposed to their asbestos-containing products and to the inhalation of the asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing products;

(b).     Caused to be released, published, and/or disseminated data and reports containing the dangers of their asbestos-containing products, which data and reports they knew, should have known, had reason to know, and/or could have reasonably been determined to be incorrect, incomplete, outdated, and misleading;

(c).     Deliberately chose to provide patently inadequate and ambiguous warnings and intentionally failed to warn of the known dangers when finally compelled by the state of medical art to provide notice of the dangers of their asbestos-containing products and the inhalation of asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of

their asbestos-containing products;

(d).    Distorted, and/or caused to be misdiagnosed, the results of medical examinations conducted upon persons and workers like the Plaintiff CHARLES B. BRINKMAN, who were using and handling said asbestos-containing products and being exposed to the inhalation of asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing products; and

(e).    Refused and failed to test their asbestos-containing products, and/or tested their asbestos-containing products and willfully concealed or refused to publish adverse test results, or distorted said adverse test results so that the public persons such as the Plaintiff CHARLES B. BRINKMAN were misled into believing the test results were not adverse.

41.    Defendants, individually, jointly, and in conspiracy with each other, participated in the fraudulent scheme described in Paragraphs Thirty-Nine and Forty (39 & 40) above, to keep the Plaintiff in ignorance of his rights by fraudulently concealing the nature and extent of the harm which he has suffered as a result of using and being exposed to the Defendants' asbestos-containing products and by fraudulently concealing that this harm was the direct and proximate result of the occupational use and exposure to the Defendants' asbestos-containing products and the inhalation of asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of said asbestos-containing products, and, in fact, said fraudulent scheme did keep the Plaintiff in ignorance of his rights.

42.    Defendants, individually, jointly, and in conspiracy with each other intended, by the fraudulent misrepresentations and omissions as set forth in Paragraphs Thirty-Nine and Forty (39 & 40) above, to induce the Plaintiff to rely upon said fraudulent misrepresentations and omissions and to continue to expose himself to the dangers that the Defendants knew to be inherent in the use of and exposure to their asbestos-containing products and the inhalation of the asbestos dust, fibers

30

and/or particles resulting from the intended, ordinary and foreseeable use of said asbestos-containing products without warning to the Plaintiff of these dangers, thereby depriving him of the opportunity of informed free choice as to whether to continue to use such asbestos-containing products and to expose himself to these dangers.

43.     Defendants, individually, jointly, in conspiracy with each other, and through trade associations in which they were members, maliciously, willfully, callously, and deliberately:

(a).     Exposed and continued to expose the Plaintiff to the risks and dangers of asbestosis, mesothelioma, scarred lungs, cancer, and other illnesses and damage to various organs of the body, including injury to tissue and bone, all of which risks Defendants knew, should have known, had reason to know and/or could have reasonably determined;

(b).     Failed to test and continue to test their asbestos-containing products regarding the risks and dangers to persons who use or were exposed to their asbestos-containing products and the inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of said asbestos-containing products;

(c).     Ignored medical and scientific data regarding the risks of asbestosis, scarred lungs, cancer, mesothelioma, and other illnesses to workers like the Plaintiff who used or were exposed to their asbestos-containing products and the inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of said asbestos-containing products;

(d).     Sought methods to ignore or defeat Workmen's Compensation and other claims of workers like the Plaintiff who suffered from illnesses or diseases from use of or exposure to their asbestos-containing products and the inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of said asbestos-containing products;

(e).     Attempted to discredit scientists, doctors, writers, and medical literature who or which indicated, demonstrated, or established a relationship between illness and disease from the

31

use of and exposure to their asbestos-containing products and the inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of said asbestos-containing products;

(f).    Refused to conduct research on the relationship between asbestos exposure and disease because pecuniary motives of profit were followed at the expense of human lives;

(g).    Sought to create favorable publicity about asbestos-containing products for pecuniary motives when they knew of their risks and dangers;

(h).    Failed to seek safe substitute products for asbestos for pecuniary motives of profit at the expense of human lives;

(i).    Misled the public and workers such as the Plaintiff who used or were exposed to their asbestos-containing products and indicated that their asbestos-containing products were safe in their intended, ordinary and foreseeable uses;

(j).    Concealed the existence of tests, data, literature, and medical reports regarding the causal relationship of asbestos to cancer, mesothelioma, scarred lungs, asbestosis, respiratory disorders and other illnesses;

(k).    Refused to authorize testing and research involving the relationship of illness and disease to exposure to, use of, and inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of their asbestos-containing products fearing adverse publicity would affect the highly profitable market of asbestos sales;

(l).    Chose to rely on inaccurate or insufficient medical and scientific research or data regarding the causal relationship between asbestos-containing products and disease in order to avoid any possible adverse publicity that would affect sales of their asbestos-containing products; and

(m).    Failed to place adequate or proper warnings on their asbestos-containing products fearing that such warnings would adversely affect sales.

32

44. Defendants as specifically identified below, individually and as agents of one another and as co-conspirators, agreed and conspired among themselves and with other asbestos manufacturers and distributors to injure the Plaintiff, CHARLES B. BRINKMAN in the following fashion:

(a). Beginning in approximately 1934, conspirator Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Anthony Lanza, Associate Director, Metropolitan Life Insurance Company (insurers of Manville and Raybestos), that Lanza publish a study on asbestosis in which Lanza would affirmatively misrepresent a material fact about asbestos exposure: that is, the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Lanza's description of asbestosis as "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it actually is and was known to be then. As a result, Lanza's study was published in the medical literature in this misleading fashion in 1935. The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raybestos and Metropolitan Life, as insurer;

(b). In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these conspirators acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and could also control in

what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact being made at scientific meetings;

      (c).    On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter ego to conspirator Turner & Newall), Raybestos-Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf;

      (d).    At this November 11, 1948 meeting, these Defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products;

      (e).    At this meeting, these Defendants intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published same in the medical literature as edited by Dr. Vorwald. These Defendants thereby fraudulently misrepresented the risks of asbestos exposure to the public, in

general, and the class of persons exposed to asbestos, including the Plaintiff;

(f).     As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene and Occupational Health in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted references to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks. The conspirators affirmatively and deliberately disseminated this misleading Vorwald publication to university libraries, government officials, agencies and others;

(g).     Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated;

(h).     The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, the National Gypsum Company, and Turner & Newall, individually and successor to Bell Asbestos.  These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardner published by Arthur Vorwald in the AMA Archives of Industrial Health in 1951.  Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators dated 10/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, 9/6/50, and 3/21/51, and all indicating close monitoring of the editing process of Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members;

(i).     Defendants who were members of the Q.A.M.A. as described above, began in or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos

35

and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control;

  (j). This plan of misrepresentation and influence over the medical literature began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed;

  (k). As a result of the termination of this study, these Defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., A.J. Lanza, M.D., Vandiver Brown and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations and the general public, including the Plaintiff;

  (l). Subsequently, the Q.A.M.A. Defendant conspirators contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer;

  (m). The Q.A.M.A. Defendant conspirators/members thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version

36

of this study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by the Defendant conspirators to be patently false;

(n).    By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, these Q.A.M.A. Defendant conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers;

(o).    In approximately 1958, these Q.A.M.A. Defendant conspirators publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer;

(p).    The fraudulent misrepresentations beginning in 1946 as elaborated above and continuing with the publication of the 1958 Braun/Truan Study influenced the standards set for threshold limit values for development of such standards to fail to lower the threshold limit value because of a cancer risk associated with asbestos inhalation;

(q).    In 1967, Q.A.M.A. Conspirators determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos-containing products;

(r).    In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators were in attendance: Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin and LaChance;

(s).    At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic property of all fiber types of asbestos was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos,

37

and in an effort to fraudulently conceal those risks from the public, these Defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Vorwald not to announce the results of his and Gardner's animal studies showing excess cancers in animals which thereby fraudulently misrepresented existing secret data which could not be publicized owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore described;

(t). The following conspirators were members of the Magnesia Insulation Manufacturers Association: Philip-Carey Corporation (predecessor to Celotex) and Johns-Manville;

(u). In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who used these products;

(v). The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasby & Mattison, individually and through its alter ego Turner & Newall, and National Gypsum;

(w). In 1947, these conspirators, members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis which suggested re-evaluation of the then-existing threshold limit values for asbestos exposure. These Defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the existing threshold limit value was acceptable. Thereafter, these Defendant conspirators withheld additional material information on the dust standards from the American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of threshold limit values for asbestos exposure;

(x). In 1953, conspirator National Gypsum, through its agents, in response to an

38

inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators;

(y).     In 1955, conspirator Johns-Manville, through its agent Kenneth Smith, caused to be published in AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers". This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation;

(z).     In 1955, the National Cancer Institute held a meeting at which conspirator Johns-Manville, individually and as an agent for other alleged co-conspirators and A. Vorwald, as agent of co-conspirators, affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies which demonstrated that positive evidence did exist;

(aa).    In 1957, these conspirators, members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of then-existing knowledge about asbestos exposure and lung cancer;

(bb).    In 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer;

(cc).    In 1970, through their agents, Defendants The Celotex Corporation and Carey-

39

Canada affirmatively misrepresented that they had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these Defendants; and

(dd).    All conspirators identified above approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan and A.J. Lanza, acting on behalf of Metropolitan Life Insurance Company, and all alleged co-conspirators during the dates and circumstances alleged above acted as agents and co-conspirators for the other conspirators.

45.    All conspirators identified above are liable for civil aiding and abetting in that they failed to warn the Plaintiff, CHARLES B. BRINKMAN of the dangers of exposure to asbestos while acting in concert with one another and/or pursuant to a common plan to actively conceal such dangers and the conspirators knew that their conduct would result in the Plaintiff CHARLES B. BRINKMAN breathing asbestos dust, fibers and/or particles without the knowledge that such exposure could foreseeably result in harm.

46.    The Plaintiff reasonably and in good faith relied upon the fraudulent misrepresentations, omissions, and concealments made by the Defendants individually, jointly, and in conspiracy with each other, regarding the safe nature of their asbestos-containing products, which reliance resulted in illness, injuries and may ultimately cause death to CHARLES B. BRINKMAN Specifically:

(a).    The material published or caused to be published by the Defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products;

(b).    The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos;

(1).   maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-containing products;

(2).   assist in the continued pecuniary gain of the Defendants through the sale of their products;

(3).   influence in the Defendants' favor proposed legislation to regulate asbestos exposure; and

(4).   provide a defense in law suits brought for injury resulting from asbestos disease.

(c).   The Plaintiff CHARLES B. BRINKMAN reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-containing products to continue his exposure to asbestos because he believed it to be safe;

(d).   The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended that the Plaintiff CHARLES B. BRINKMAN rely upon the published reports regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products, to continue his exposure to those products;

(e).   The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators were and are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Plaintiff CHARLES B. BRINKMAN had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products; and

(f).    As a direct and proximate result of the acts alleged herein the Plaintiff now suffers damages as described in Court VI.

## COUNT VI - CONCLUSION

47.     The Plaintiffs hereby incorporate by reference Paragraphs ONE (1) through FORTY-SIX (46) inclusive, as if the same were hereto set forth at length.

48.     As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, willful or wanton misconduct, breach of warranty, strict liability, fraudulent concealment, misrepresentations and willful omissions of the Defendants, the Plaintiff CHARLES B. BRINKMAN was caused to contract diseases and injuries to his body systems, lungs and heart, including malignant mesothelioma, which have caused the Plaintiff CHARLES B. BRINKMAN pain, suffering, mental anguish and ultimately may cause his death.  In addition, CHARLES B. BRINKMAN:

(a).     Has been obliged to spend various sums of money to treat his diseases and injuries; and may be obliged to continue to do so in the future;

(b).     Has sustained a loss of earnings and earning capacity;

(c).     Has had his enjoyment of life impaired;

(d).     Has had his life expectancy shortened; and

(e).     Has been caused to suffer great psychic trauma including cancer phobia.

49.     Any delay in filing the Plaintiff's causes of action is a direct and proximate result of the Defendants' failure to warn the fraudulent concealment hereinafter described:

(a).     For a long time the Defendants have known of the hazards of asbestos inhalation and ingestion and had the duty to warn foreseeable users like the Plaintiff CHARLES B. BRINKMAN, of the hazards of their asbestos-containing products.  However, the Defendants intentionally and fraudulently concealed said knowledge from the Plaintiffs resulting in the failure of the Plaintiffs to discover the facts which are the basis of their causes of action despite the exercise of due diligence on behalf of the Plaintiffs.  Accordingly, any attempt on the part of any Defendant to

43

complain about the timeliness of the commencement of Plaintiffs' causes of action should be estopped.

50.     By reason of the aforesaid injuries to Plaintiff, CHARLES B. BRINKMAN, Plaintiff's spouse LOUISE K. BRINKMAN has suffered mental anguish by being forced to witness the suffering endured by Plaintiff whereby Plaintiff's spouse's own nerves and health have been seriously and permanently shocked, weakened and impaired; and by reason of the physical and mental condition of the Plaintiff, Plaintiff's spouse continues to suffer in mind and body, and have been denied the care, protection, consideration, companionship, services, income, aid, pleasure, assistance, and society of Plaintiff, CHARLES B. BRINKMAN.

WHEREFORE, Plaintiffs pray for judgment against the Defendants, individually and jointly and severally, for compensatory damages in the sum of TWENTY MILLION DOLLARS ($20,000,000.00) and punitive damages in the sum of TWENTY MILLION DOLLARS ($20,000,000.00) together with interest from the date of diagnosis of asbestos-induced disease plus costs of this suit and such other and further relief as is just and proper.

Respectfully submitted,

PATTEN, WORNOM, HATTEN
& DIAMONSTEIN, L.C.

By:_____
                    Of Counsel

Hugh B. McCormick, III, Esquire (VSB No. 37513)
Robert R. Hatten, Esquire (VSB No. 12854)
Donald N. Patten, Esquire (VSB No. 06869)
William W. C. Harty, Esquire (VSB No. 45447)
Jennifer W. Stevens, Esquire (VSB No. 43275)
Erin E. Jewell, Esquire (VSB No. 71082)
F. Alex Coletrane, Esquire (VSB No. 78381)
Rachel M. Swyers, Esquire (VSB No. 85972)
PATTEN, WORNOM, HATTEN
        & DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, VA 23602
Telephone (757) 223-4500
Facsimile (757) 249-3242
pleadings@pwhd.com
hughmccormick@pwhd.com

PLAINTIFFS DEMAND A JURY WITH RESPECT TO ALL ISSUES
TO WHICH THEY ARE ENTITLED BY LAW TO A JURY.